IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| JUANITA YVON BRIDGES, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 10-863 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pending before the Court are cross-motions for summary judgment

filed by Plaintiff Juanita Yvon Bridges and Defendant Michael J.

Astrue, Commissioner of Social Security.   Plaintiff seeks review of

final decisions by the Commissioner denying her claims for disability

insurance benefits ("DIB") under Title II of the Social Security Act,

42 U.S.C. §§ 401 *et seq.* and supplemental security income benefits

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381

*et seq.*   For the reasons discussed below, Defendant's motion is

granted and Plaintiff's motion is denied.

**II.   BACKGROUND**

A.   Factual Background

Plaintiff Juanita Yvon Bridges was born on July 5, 1954.

(Certified Copy of Transcript of Proceedings before the Social

Security Administration, Docket No. 7, "Tr.," at 177.)   Although she

dropped out of high school in the eleventh grade, she eventually received her GED and took post-graduate courses in secretarial skills and real estate. (Tr. 154.) On July 17, 2006, Ms. Bridges was working as a secretary for a charitable organization when she began feeling dizzy at work. She consulted with a nurse practitioner who recorded a blood pressure of more than 200 over 100 and advised her to go to a hospital emergency room in Sharon, Pennsylvania. (Tr. 149, 156, 231.) After a number of diagnostic examinations and medication for uncontrolled hypertension (with which she had been diagnosed in 1990), Ms. Bridges was released. She was told to stop smoking and drinking, to be compliant with her medication, and to follow up with her family physician. (Tr. 218-250.)

B.    Procedural Background

On August 15, 2006, Ms. Bridges protectively filed applications for supplemental security income and disability insurance benefits, alleging disability as of July 17, 2006, due to anxiety, depression, low heart rate and hypertension. (Tr. 121-133, 148-155.) The Social Security Administration denied her applications on January 19, 2007, reasoning that although she could not return to her previous work as a secretary due to her non-exertional limitations,[1] there were other jobs existing in the

---

[1] Non-exertional limitations are those which affect a person's ability to meet job demands other than strength demands (e.g., sitting, standing, walking, lifting, carrying, pushing, and pulling.)    Examples   of

2

national economy which she could perform. (Tr. 87-89.)

Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 25, 2008, before Judge David G. Hatfield. Ms. Bridges, who was represented by counsel, testified, as did an impartial vocational expert ("VE"), Karen S. Krull, M.Ed. Judge Hatfield issued his decision on August 22, 2008, again denying benefits. (Tr. 21-27.) On April 27, 2010, the Social Security Appeals Council advised Ms. Bridges that it had chosen not to review the ALJ's decision, finding no reason under its rules to do so. (Tr. 1-5.) Therefore, the August 22, 2008 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). On June 29, 2010, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. §405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court

non-exertional limitations include mental impairments, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, handling environmental features of a work setting such as dust or fumes, and postural functions such as reaching, handling, stooping, climbing, crawling, or crouching. 20 C.F.R. § 416.969(c).

3

of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential,

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

## IV. **ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[2] currently existing in the national economy.[3] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v.

---

[2] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[3] A claimant seeking supplemental security income benefits must also show that her income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

5

Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be granted a period of disability and receive disability insurance benefits, a claimant must also show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured. 42 U.S.C.§ 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Ms. Bridges satisfied the first two non-medical requirements for disability benefits and the parties do not object to the ALJ's finding that Plaintiff's date last insured was June 30, 2010. (Tr. 95.)

To determine a claimant's rights to either SSI or DIB,[4] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[5] to perform her past relevant work, she is

---

[4] The same test is used to determine disability for purposes of receiving either DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

[5] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9p

not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Hatfield first concluded Ms. Bridges had not engaged in substantial gainful activity since July 17, 2006. (Tr. 95.) In resolving step two, the ALJ found that as of the date of the hearing, Plaintiff suffered from three severe impairments, i.e., hypertension, sacroiliitis, and right hip bursitis.[7] (Id.) He further noted that Ms. Bridges had claimed

---

defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[6] Step three involves a conclusive presumption based on the Listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

[7] Sacroiliitis is inflammation of the sacroiliac joint or region, the area in the lower back where the lowest bone of the spine (the sacrum) attaches to the two bones forming the back of the pelvis [continued]

7

disability due in part to mental impairments such as anxiety and depression, but based on his review of the medical record and other evidence such as Plaintiff's self-reported activities of daily living, he concluded that these had no more than a minimal impact on basic work-related activities. (Tr. 95-96.)

At step three, the ALJ concluded none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any relevant Listing. In arriving at this conclusion, Judge Hatfield specifically reviewed Plaintiff's history of hypertension and bradycardia[8] in light of Listing 4.01 (cardiovascular system) and related Listings, and her sacroiliitis and bursitis in light of Listings 1.02 (major dysfunction of a joint due to any cause) and 1.04 (disorders of the spine.) (Tr. 96.)

At step four, the ALJ found Plaintiff that retained the residual functional capacity to perform a full range of light work.[9] Judge

(the ilium.) Bursitis is the inflammation of the small serous sac between a tendon and a bone that protects the joint. *See* the medical dictionary maintained by the National Institutes of Health at www.nlm.nik.gov/ medlineplus ("Medline Plus"), last visited December 15, 2010.

[8] Bradycardia refers to relatively slow heart action due to either physiological or pathological causes. *See* medical dictionary at Medline Plus.

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the

Hatfield reached this conclusion after considering in detail Ms. Bridges's subjective symptoms, primarily pain associated with her bursitis and sacroiliitis, and the medical evidence of record. (Tr. 97-98.) As part of this step, the ALJ explained the weight he gave to the records provided by Dr. Jose J. Millan, a specialist who had treated Plaintiff's hypertension and related cardiac conditions, and by Dr. Edward Uberti, one of Plaintiff's treating physicians[10] who had opined that Ms. Bridges was disabled from even sedentary work.[11] (Tr. 96-99.) The ALJ further concluded that since she was able to perform light work, she could return to her former job as a secretary

---

claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

[10] Social Security regulations identify three categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R.§§ 404.1502 and 416.902.

[11] The term "sedentary" describes work which requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Jobs are sedentary even if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567 and 416.967. A sedentary job should require no more than approximately two hours of standing or walking per eight hour work day, and sitting should typically amount to six hours per eight hour work day. Social Security Ruling 83-10.

(which is considered skilled sedentary work), assuming she would be able to alternate between sitting and standing every 30 minutes. (Tr. 99; *see also* testimony of the Vocational Expert at Tr. 77-79.) Alternatively, she would be able to perform other light or sedentary jobs such as a security guard, cashier, or information clerk, all of which were available in the national economy, although the total number of such jobs would be reduced because of the need to alternate sitting and standing. (Tr. 100; *see also* Tr. 79-80.) Consequently, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity, as well as the testimony of the Vocational Expert, the ALJ concluded that Plaintiff had not been under a disability between July 17, 2006, and the date of his decision and was therefore not entitled to benefits. (Tr. 99-100.)

## B. Plaintiff's Arguments

Ms. Bridges raises three main arguments in her brief in support of the motion for summary judgment. (Doc. No. 10, "Plf.'s Brief.") First, the ALJ failed to provide a proper rationale for his decision, second, he failed to properly analyze all of the evidence in the record, and third, he erred in finding that Plaintiff could perform a full range of light work. We address each of these arguments in turn. Because Ms. Bridges does not take issue with the ALJ's conclusion that her anxiety and depression were not severe

10

impairments, we omit the evidence pertaining to her mental health conditions.

1. *The ALJ failed to provide a proper rationale for his decision.* Plaintiff argues first that the ALJ failed to provide a proper rationale for his decision in that he did not set out a "specific factual basis for each finding" and erred by simply referring to "the record as a whole." Under Social Security Ruling[12] ("SSR") 83-12, the ALJ is required to provide a "clear, persuasive, orderly rationale, reflecting the sequential evaluation process, with recitations of the evidence and specific findings of fact." (Plf.'s Brief at 8.)

We can quickly address and dismiss this argument. Social Security Ruling 83-12, "The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations within a Range of Work or between Ranges of Work," states that where the claimant has exertional limitations within a range of work or between ranges of work, i.e., her residual functional capacity does not coincide precisely with any of the recognized categories of work,[13] the ALJ

---

[12] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

[13] Social Security regulations recognize five categories of work –

11

is advised to consult a vocational expert as to what jobs a claimant can or cannot perform and the extent to which those jobs occur in significant numbers in the economy. The ALJ should apply the same standard in evaluating each step of the analysis as when the claimant's exertional limitations plainly fall within a single category, that is, a "clear, persuasive, orderly rationale, reflecting the sequential evaluation process, with recitations of the evidence and specific findings of fact."

Here, that is exactly what the ALJ did. Ms. Karen Krull, a Vocational Expert, testified at the hearing in response to questions by both the ALJ and Plaintiff's counsel. (Tr. 76-83.) Each step of the ALJ's analysis is clearly laid out and reference made to specific points in the record at each step. In the case on which Ms. Bridges relies in this section of her brief, Carter v. Apfel, 220 F. Supp.2d 393 (M.D. Pa. 2000), the plaintiff had specifically identified the reports of the chiropractor from whom he had received a "significant amount" of his treatment, but whose opinions had not been mentioned by the ALJ in his decision. Id. at 396-397. By contrast, Ms. Bridges does not explain where the ALJ relied on a reference to the record "as a whole" rather than identifying the precise evidence which supported his conclusions and the Court has been unable to identify any such references. In fact, the ALJ is

_____

sedentary, light, medium, heavy, and very heavy. 20 C.F.R. §§ 404.1567 and 416.967.

12

*required* to consider the entire record, that is, the medical evidence, other evidence of record (e.g., earnings reports or information compiled by Social Security Administration staff), and the claimant's own statements both written (e.g., the questionnaire regarding her activities of daily living) and verbal through testimony. *See* Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), *cert. denied*, 420 U.S. 931 (1975); Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (the ALJ must "scrutinize the record as a whole.") As will be discussed below in more detail, the ALJ clearly did just that in his decision. Plaintiff's first argument for summary judgment in her favor must fail.

2. *The ALJ failed to properly analyze all of the evidence in the record.* This argument has multiple facets which we will address sequentially. Ms. Bridges first argues that "[n]o adequate explanation is given as to why the detailed medical source statements provided by Dr. Uberti were disregarded." She contends argues that the ALJ took one statement out of context, i.e., her comment that physical therapy was "doing wonderful for me," and disregarded Dr. Uberti's other findings that she was totally disabled. Because, she argues, there is no medical evidence to refute the "well-supported opinion" of her treating physician, the ALJ is "bound by it." (Plf.'s Brief at 8.)

The Court has reviewed the medical records, in particular those

13

of Dr. Uberti, an orthopedic specialist who began treating Ms. Bridges in November 2007, after she fell while on her way to the library. As she fell, she struck the right side of her body, breaking her elbow and seriously bruising her right hip. (Tr. 338.) Dr. Uberti prescribed physical therapy and Mobic.[14] (Tr. 352.) On January 4, 2008, Ms. Bridges was still complaining of pain in her right hip and physical therapy was "just minimally helping her." At that appointment Dr. Uberti injected the right sacroiliac joint with lidocaine and Depo-Medrol to relieve the inflammation. (Tr. 351.) By April 4, 2008, although the pain in her broken elbow had subsided, she was complaining of a new type of pain in her right hip which increased when she lay on her right side. Dr. Uberti noted that the previous physical therapy program three times a week for four weeks had "afforded her approximately 90% relief in her symptoms" and suggested that she initiate a new therapy program. (Tr. 350.)

In May 2008, Ms. Bridges was participating in physical therapy and stated to Dr. Uberti that "PT is doing wonderful for me." (Tr. 349.) She was still having pain in the sacroiliac joint and along the greater trochanteric area[15] of the right hip which Dr. Uberti

---

[14] Mobic (generic name meloxicam) is a nonsteroidal anti-inflammatory drug used to relieve pain, tenderness, swelling and stiffness. *See* drugs and supplements entry at Medline Plus.

[15] The greater trochanter is a rough prominence at the upper part of the femur to which muscles of the leg and hip are attached. *See* medical dictionary at Medline Plus.

diagnosed as bursitis. He repeated the injections in each of those joints and directed her to follow up in four to six weeks. (Id.) In June, he renewed the prescription for water exercises after Ms. Bridges complained of worsening pain in her right hip, but there is no evidence that additional injections were required. (Tr. 348, 358.)

At the request of Plaintiff's counsel, Dr. Uberti completed a physical capacities evaluation on June 6, 2008, in which he indicated that Ms. Bridges could sit for a total of four hours in an 8-hour work day and could stand and walk for one hour each. She could occasionally lift and carry up to 10 pounds; had no problems with simple grasping, pushing, pulling or fine manipulation with either hand; could use her left foot but not the right for repetitive movements or pushing and pulling of leg controls; could never bend, squat, crawl, or climb; should not be exposed to unprotected heights, moving machinery, marked changes in temperature and humidity, or to dust, fumes and gases; and was mildly restricted in driving automotive equipment. (Tr. 359.) On June 20, 2008, he completed a pain questionnaire in which he concluded that Ms. Bridges was precluded from engaging in even sedentary work on a regular and competitive basis, due in part to "pain so intense as to be totally disabling." (Tr. 361.) Finally, Dr. Uberti provided answers to medical interrogatories on July 11, 2008, in which he concluded that

15

Ms. Bridges was "incapable of sedentary work." (Tr. 378-379.) The final note from Dr. Uberti dates from August 29, 2008, in which he stated that physical therapy aquatics had "helped her quite a bit" and that she was going to continue the regimen on her own, along with some stretching exercises he had shown her. [16] She was given a prescription for Mobic which she could take "as needed when [pain] flares up." (Tr. 419.)

Contrary to Plaintiff's argument that the ALJ rejected Dr. Uberti's opinions without serious discussion and took the single statement that she was "doing wonderful" with physical therapy out of context, Judge Hatfield clearly reviewed all of that physician's medical records. (Tr. 96, 98.) He explained that Dr. Uberti's conclusion that Ms. Bridges was completely disabled even from sedentary work was inconsistent with his own treatment notes and with the opinions of other physicians who had treated Plaintiff simultaneously for her cardiac problems. (Tr. 98-99.)

We find this conclusion by the ALJ is based on an accurate reading of the medical records. For example, as can be seen from the summary above, Dr. Uberti's conclusion on June 20, 2008, that Ms. Bridges' pain was totally disabling (Tr. 361) is entirely inconsistent with the fact that she testified three days later on

---

[16] We note that between June 2008 and August 2008, Plaintiff cancelled or failed to show for physical therapy appointments on June 13, June 30, July 2, July 7, July 8, July 9, and July 30. (Tr. 393, 388-389 and 407.)

16

June 25 that she was taking no pain medication. (Tr. 61, 73.) Dr.
Uberti's notes also indicate that on August 29, 2008, she was still
taking no pain medication but was given a prescription for Mobic to
be taken "as needed" when the pain flared up (Tr. 419.) Similarly,
although Ms. Bridges complained on January 4, 2008, that the pain
in her right hip was so severe Dr. Uberti injected it with lidocaine
and Depo-Medrol, she told her cardiologist, Dr. Millan, on January
9, 2008, just five days later, that although she experienced chest
discomfort and shortness of breath when she walked up and down steps,
she was "walking two or three miles per day" for exercise and did
not experience any painful symptoms. (Tr. 309.) In short, the ALJ
did not, as Ms. Bridges claims, reject Dr. Uberti's description of
her as totally disabled without explanation. He clearly stated that
it was inconsistent with the physician's own records and with other
medical evidence of record, a conclusion that is supported by a review
of the entire medical file.

Plaintiff's second argument about the ALJ's analysis is that
Judge Hatfield erred by relying on the opinion of a non-examining
state agency medical consultant who did not review the majority of
her treating physicians' opinions or examine her. (Plf.'s Brief at
9.) We agree that the medical consultant's report was completed in
October 2006, well before Ms. Bridges injured her hip and elbow when
she fell, and before many of the other medical records in the file

17

were prepared. In that report, the consultant noted that Ms. Bridges could occasionally lift and/or carry 20 pounds and 10 pounds frequently, and could stand, walk or sit for six hours in an 8-hour day. (Tr. 278-284.) Judge Hatfield mentioned this report at only one point in his decision, noting his assessment that Plaintiff could perform light work is "quite consistent with that offered by the state agency medical consultant who reviewed this case." (Tr. 99.) However, Plaintiff fails to take into consideration the immediately preceding sentence in which the ALJ explains that in arriving at this conclusion he had given greater weight to notes of long-term treating providers at Farrell Health Center who indicated that Ms. Bridges was employable than to those of Dr. Uberti who concluded that she was totally disabled. That is, the ALJ *did not* rely entirely on the non-examining state consultant in arriving at his RFC assessment but on substantial medical advice from other treating medical sources.

This portion of the ALJ's decision is supported by the reports of Lori Leipheimer, a certified registered nurse practitioner[17] who

_____

[17] Certain individuals who, although not categorized as "acceptable medical sources," may provide evidence to show the severity of the alleged impairment and how it affects the claimant's ability to work. 20 C.F.R. § 404.1513(d). The Social Security Administration has recently recognized that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources. . .such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity

18

treated Ms. Bridges regularly for three years (June 2005 through June 2008) and who on two separate occasions noted that Ms. Bridges could return to work. On May 29, 2007, when Ms. Bridges told Ms. Leipheimer that she was "currently looking for a job," Ms. Leipheimer noted, "I informed her that there is no further reason to keep her on disability, that she is employable, however, I did give her 3 more months of temporary disability, in that timeframe she is to find a job, after that we're going to have to list her as employable." (Tr. 341.) This was reiterated on September 26, 2007, when Ms. Bridges again requested that medical assistance forms be completed. Ms. Leipheimer noted she had already discussed the employability issue with Ms. Bridges and stated, "in my medical opinion she is employable." (Tr. 340.) Thus the evidence shows that at least one of Ms. Bridges's medical providers believed as early as mid-2007 that Plaintiff could return to work, a finding that the ALJ specifically

and functional effects, along with the other relevant evidence in the file. . . . The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors. . . . Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." SSR 06-3p, "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Non-governmental Agencies." The policy statement goes on to point out that while the general rule for weighing medical opinions remains unchanged, in some circumstances, the opinion of a medical source who is not an "acceptable medical source" may outweigh even the opinion of a treating source, particularly where the "non-acceptable" medical source has seen the claimant more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. (Id.)

mentioned as being evidence on which he relied in reaching his conclusion that she could perform light work.

Third, Ms. Bridges argues that the ALJ erred when he commented that he had observed her at the hearing and that she showed no serious signs of pain or mental confusion. She contends this was an improper "sit and squirm" test and that the ALJ erred by using his personal observations to override medical opinions of a treating physician that are supported by the record. (Plf.'s Brief at 9.)

The so-called "sit and squirm" test refers to those situations in which the ALJ reaches his conclusions "by relying solely on his own non-expert observations at the hearing" and rejecting without explanation contrary medical evidence which supports the claimant's allegations of disability. Van Horn v. Schweiker, 717 F.2d 871, 874 (3d Cir. 1983). However, where the ALJ uses "his observations to reinforce, not to supplant, a conclusion drawn from the medical evidence," he is not applying the improper "sit and squirm" test. DeMarco v. Heckler, 616 F.Supp. 644, 647 (E.D. Pa. 1985.) In fact, the ALJ is expected to observe the claimant's demeanor during the hearing as part of his credibility determination. *See* Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (a reviewing court will "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.")

20

In his decision, the ALJ noted that during the hearing Ms. Bridges "showed no serious signs of pain or mental confusion and was able to present her case in a reasonable fashion." (Tr. 99.) This was only one in a series of points the ALJ made in his analysis of Ms. Bridges's credibility. Thus it is entirely dissimilar to the case relied upon by Plaintiff, Morales, *supra*, where the ALJ disregarded a treating physician's medical opinion because he did not believe the claimant's testimony at the hearing. The Court of Appeals concluded that doing so was improper because the physician's opinion was consistent with the conclusions of other medical providers. *See* Morales, 225 F.3d at 318. As discussed above, Dr. Uberti's conclusion that Plaintiff was entirely disabled is inconsistent both with his own contemporaneous records and those of Ms. Leipheimer and Dr. Millan. Judge Hatfield's single comment on Ms. Bridges's behavior at the hearing was expressed properly in the context of his credibility analysis and we find no error in its inclusion.

Next, Ms. Bridges argues that the ALJ erred by "selectively lifting" those bits of evidence which indicated her conditions were improving and ignoring the "major, fundamental and ultimate findings" of those medical providers who disagreed. (Plf.'s Brief at 10.) Again, we disagree. Judge Hatfield's decision does not reflect impermissible "cherry picking" where the ALJ selectively

21

relies on those parts of the record which support his conclusion that the claimant is not disabled and ignores contrary evidence. Review of the medical evidence shows that Dr. Uberti was the only physician over the course of three years who concluded Plaintiff was unable to work. (*Compare* this conclusion with Ms. Leipheimer's comments from May and September 2007 about Ms. Bridges being able to return to work (Tr. 340-341)and those of Dr. Millan in January 2008 that she was able to walk two or three miles a day without experiencing shortness of breath or other disabling problems (Tr. 309.)) The ALJ explicitly cited to the record regarding Dr. Uberti's "major, fundamental and ultimate finding" that Plaintiff was totally disabled (Tr. 98-99) and discussed his reasons for rejecting it, i.e., the internal inconsistencies and the contradictory medical evidence in the record.

Finally, Plaintiff argues that the ALJ erred in his credibility analysis when he concluded that although her impairments were severe and of the type which could reasonably be expected to produce pain, he found her less than credible even though none of the medical professionals who have treated her doubted her credibility. Moreover, where subjective testimony as to the extent and effect of pain is corroborated by competent medical advice, it should be given great weight unless there is "medical evidence to disprove a Claimant's testimony as to pain." (Plf.'s Brief at 10-12, relying

on Mason, 994 F.2d 1067-1068.)

We have already discussed the medical evidence on which the ALJ relied in concluding that Plaintiff's pain was not as disabling as she testified and as Dr. Uberti stated. Again, the ALJ had ample medical evidence to reach the conclusions he did regarding both the extent of her pain and her credibility and we will not disturb his decision.

3. *The ALJ erred in finding Ms. Bridges had the RFC to perform the full range of light work.* Plaintiff's entire argument on this subject is a single sentence: "The medical evidence, especially the physical capacities evaluation of Dr. Edward Uberti, cannot support such an RFC determination." (Plf.'s Brief at 12, *citing* Tr. 359.) Without further development of this argument, the Court interprets it as simply a reiteration of the argument above that the ALJ erred in rejecting Dr. Uberti's report of June 6, 2008, and, for the reasons discussed above, finds it unpersuasive.

4. *The ALJ erred by not considering whether Plaintiff was "closely approaching advanced age."* Plaintiff incorporates in her brief the arguments made before the Appeals Council. (Plf.'s Brief at 12, *citing* Tr. 7-9.) The Court has reviewed these arguments and finds them, with one exception, duplicative of those rejected above. The one point which should be mentioned is a rather incomplete argument that because of Plaintiff's age at the time of

the hearing, she is so close to "advanced age" that if she were limited to sedentary work, the Social Security "grids" which compare exertion level with a claimant's age, ability to speak English, education, and transferrable skills would require a finding of disabled. (Tr. 8-9.)

The Social Security Administration considers adult claimants to fall in one of three age brackets: "younger individual" (ages 18 to 49, with a subset of special conditions applying to individuals 45 through 49), "closely approaching advanced age" (ages 50 to 54), and advanced age (55 and above, with a subset of those "closely approaching retirement age," i.e., 60 and older.) 20 C.F.R. §§ 416.963(c)-(e) and § 416.968(d)(4). In general, these brackets make "bright-line distinctions by age," but when claimants are "within a few days to a few months of reaching an older age category and using the older age category would result in a determination or decision that [they] are disabled, [the SSA] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the] case." Lucas v. Barnhart, No. 05-3973, 2006 U.S. App. LEXIS 14487, *6 (3d Cir. June 12, 2006), quoting 20 C.F.R. § 404.1563(b) (alteration in original.) The question then becomes whether the ALJ is required to determine if the claimant would be considered disabled if the criteria of the next-older bracket were applied, i.e., what does "borderline" mean.

Here, Plaintiff was born on July 5, 1954, and the hearing before the ALJ was held on June 25, 2008. Thus, she was just ten days short of her fifty-fourth birthday at that time, and approximately 10 and one-half months short of her fifty-fifth birthday when his decision was handed down on August 22, 2008. Case law from the Third Circuit Court of Appeals and other district courts in this Circuit would support the conclusion that the ALJ is not required to consider if this is a borderline case when the claimant is more than ten months short of achieving the next higher age category. Compare cases in which the court concluded that the ALJ should have addressed the borderline qualification issue, e.g., Lucas, 2006 U.S. App. LEXIS 14487 at *10 (106 days between claimant's age on his date last insured and his 55th birthday); Kane v. Heckler, 776 F.2d 1130, 1131 (3d Cir. 1986) (48 days to relevant birthday); Autry v. Astrue, CA No. 09-3726, 2010 U.S. Dist. LEXIS 115293, * 4 (E.D. Pa. Oct. 27, 2010)(56 days between date of decision and birthday); Neal v. Astrue, CA No. 09-1658, 2010 U.S. Dist. LEXIS 77091, *37-*39 (W.D. Pa. July 30, 2010) (approximately 6 months from reaching next age category); Morealli v. Astrue, CA No. 08-356, 2010 U.S. Dist. LEXIS 15775, *22-*26 (W.D. Pa. Feb. 23, 2010)(5½ months before reaching next age category); Kappler v. Comm'r of Soc. Sec., CA No. 08-5251, 2010 U.S. Dist. LEXIS 10539, *15-*19 (D. N.J. Feb. 8, 2010) (5 months short of advanced age category); Hitchcock v. Comm'r of SSA, CA No. 09-551, 2009 U.S.

25

Dist. LEXIS 118504, *28-*34 (W.D. Pa. Dec. 21, 2009) (11 days short of 55th birthday); and Istik v. Astrue, CA No. 07-1468, 2009 U.S. Dist. LEXIS 11213, *8-*13 (W.D. Pa. Feb. 13, 2009) (7 months between decision and 55th birthday),[18] with cases where the analysis was determined to be unnecessary, e.g., Roberts v. Barnhart, No. 04-3647, 2005 U.S. App. LEXIS 14408, *3-*4 (3d Cir. July 15, 2005) (there is "no authority" extending the benefits of the borderline analysis to a claimant who was "five to six months" short of a birthday which would put her in the next age category); Bastidas v. Astrue, CA No. 10-193, 2010 U.S. Dist. LEXIS 114709, *13-*14 (W.D. Pa. Oct. 28, 2010) (111 days between date of decision and claimant's 55th birthday); Rhoades v. Comm'r of Soc. Sec., CA No. 09-1555, 2010 U.S. Dist. LEXIS 38811, *2, n.1 (W.D. Pa. Apr. 20, 2010) (more than 11 months between alleged onset date and relevant birthday); and Davis v. Astrue, CA No. 09-928, 2009 U.S. Dist. LEXIS 92303, *17-*20 (W.D. Pa. Oct. 5, 2009) (claimant "a little more than four months" short of her 55th birthday.)   In sum, it seems unlikely that any court in this Circuit would find that the ALJ erred by failing to conduct the borderline analysis if his decision is rendered more than ten months before the claimant would reach an age category where the combination of age, exertional, and other considerations would make her eligible for

---

[18]   Istik (McVerry, J.) is highly recommended for not only the theoretical analysis of the borderline issue, but also as a compendium of cases throughout the country which address the question.

26

benefits through applications of the grids. *See* <u>Martin v. Astrue</u>, CA No. 07-1316, 2008 U.S. Dist. LEXIS 60461, \*25 (W.D. Pa. Aug. 1, 2008) (the outer limit of a borderline consideration "is appropriately drawn somewhere inside a 191 day period"); <u>Russell v. Commissioner of Soc. Sec.</u>, 20 F. Supp.2d 1133, 1135 (W.D. Mich. 1998) (the Appeals Council appears to believe "there is a six-month window in which a claimant's situation is 'borderline.'") We therefore reject this argument as well.

Having concluded that none of Plaintiff's arguments provides a reason to reverse the ALJ's decision denying benefits or to remand for further consideration, Plaintiff's motion for summary judgment is denied and Defendant's motion is granted. An appropriate order follows.

December ___21___ , 2010     *William L. Standish*
                            William L. Standish
                            United States District Judge

27